IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LYNN M. CIMINO, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 15-1145 |
| | ) | |
| v. | ) | |
| | ) | |
| MAGEE-WOMENS HOSPITAL | ) | |
| OF UPMC, | ) | Judge Cathy Bissoon |
| | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM ORDER**

Pending before the Court is Defendant Magee-Womens Hospital of UPMC ("Defendant" or "UPMC")'s Motion for Summary Judgment (**Doc. 31**). For the reasons that follow, Defendant's Motion for Summary Judgment will be GRANTED IN PART AND DENIED IN PART.

**I.  MEMORANDUM**

**A. BACKGROUND**

Plaintiff, Lynn Cimino ("Plaintiff" or "Cimino"), began working at Magee-Womens Hospital in September 1986 as a Registered Nurse. (Defendant's Concise Statement of Material Facts (Doc. 33)) at ¶1; (Plaintiff's Response to Defendant's Concise Statement of Material Facts (Doc. 37)) at ¶1. Cimino held various nursing-related positions with Magee-Womens Hospital, eventually becoming Unit Director of the Neonatal Intensive Care Unit ("NICU"), the position she held at the time of her separation. (Doc. 33) at ¶ 2; (Doc. 37) at ¶ 2. The Unit Director was responsible for managing the clinical, financial and administrative operations of the NICU.

1

(Doc. 33) at ¶ 3; (Doc. 37) at ¶ 3.  In April 2014, Susann Guess became the Director of Patient Care Services for Neonatal and Cimino's direct supervisor.  (Doc. 33) at ¶ 6; (Doc. 37) at ¶ 6.

In late February 2015, UPMC began a system-wide cost-savings initiative.  (Doc. 33) at ¶ 7; (Doc. 37) at ¶ 7.  In March, Magee-Womens Hospital notified Directors, including Guess, of the need to find ways to reduce costs in their units.  (Doc. 33) at ¶ 8; (Doc. 37) at ¶ 8.  Guess was tasked with finding approximately $250,000 of cost-savings in the NICU's budget.  (Doc. 33) at ¶ 9; (Doc. 37) at ¶ 9.  Guess worked with Chief Nursing Officer Marybeth McLaughlin to suggest cost-savings solutions.  (Doc. 33) at ¶ 10; (Doc. 37) at ¶ 10.  In March or April, Guess presented McLaughlin with the option to eliminate Cimino's position.  (Plaintiff's Concise Statement of Material Facts (Doc. 36)) at ¶ 45.  On April 10, 2015, Plaintiff's position was "listed for the RIF."  (Doc. 36) at ¶ 47; (Defendant's Response to Plaintiff's Concise Statement of Material Facts (Doc. 40)) at ¶ 47.  That list was "the start of a . . . finalized list to be submitted."  (Doc. 33) at ¶ 13; (Doc. 37) at ¶ 13.  On May 11, an updated list of "possible reductions" was circulated, and that list also included the NICU Unit Director position, along with several others.  (Doc. 33) at ¶ 14; (Doc. 37) at ¶ 14.

On May 12, 2015, Plaintiff applied for FMLA leave to care for her father.  (Doc. 36) at ¶ 52; (Doc. 40) at ¶ 52; see also (Doc. 33) at ¶ 16; (Doc. 37) at ¶ 16.  Plaintiff submitted her request to UPMC's third-party provider, WorkPartners.  (Doc. 33) at ¶ 15; (Doc. 37) at ¶ 15.  On May 20, 2015, Plaintiff submitted additional documentation to WorkPartners supporting her FMLA leave request.  (Doc. 33) at ¶ 18; (Doc. 37) at ¶ 18.  The FMLA paperwork indicated that from June 4, 2015, to June 18, 2015, Plaintiff's father might require care for day-to-day needs like making meals, bathing, getting to the restroom and getting around in general.  (Doc. 33) at ¶ 19; (Doc. 37) at ¶ 19.  The paperwork also indicated that from June 19, until August 26, 2015,

Plaintiff's father might need intermittent care to get to and from doctor follow-up appointments and physical therapy appointments. (Id.) To support these needs, the FMLA paperwork requested that Plaintiff be granted intermittent leave for 1-2 hours per day, 2-3 days per week from June 19, until August 26, 2015. (Doc. 33) at ¶ 20; (Doc. 37) at ¶ 20. On May 29, 2015, WorkPartners approved Plaintiff for intermittent leave for 3 days per week for 2 hours each event, beginning on June 4, 2015. (Doc. 33) at ¶ 21; (Doc. 37) at ¶ 21.

On July 2, 2015, Plaintiff submitted additional paperwork requesting adjustments to her current FMLA leave due to complications her father experienced from his initial surgery. (Doc. 33) at ¶ 22; (Doc. 37) at ¶ 22. The July 2 FMLA documentation indicated that Plaintiff needed intermittent leave 3 hours per day, 5 days per week from June 23, to July 16, 2015, and then 2 hours per day, 3 days per week from July 17, to September 11, 2015. (Doc. 33) at ¶ 23; (Doc. 37) at ¶ 23. The FMLA paperwork also stated that she would need to attend all day appointments on July 2, July 15 and July 20, 2015, for previously scheduled follow up appointments. (Id.) On July 7, 2015, WorkPartners approved Cimino for intermittent or reduced schedule leave 5 days per week, 3 hours per day from June 4, to July 16, 2015. (Doc. 33) at ¶ 24; (Doc. 37) at ¶ 24. On July 9, 2015, WorkPartners approved Cimino for intermittent or reduced schedule leave 3 days per week, 2 hours per day from July 17, to September 11, 2015. (Doc. 33) at ¶ 25; (Doc. 37) at ¶ 25. The approval paperwork did not reflect Cimino's request for all-day leave to attend her father's appoints on July 2, July 15, and July 20, 2015. See (Doc. 34-2) at 21-24.

Despite being eligible for FMLA leave, Cimino decided not to take leave while her father was an in-patient and to begin taking leave only after he was discharged from the hospital. (Doc. 33) at ¶ 28; (Doc. 37) at ¶ 28. Furthermore, throughout the course of her intermittent leave

entitlement, Cimino took .550 weeks (approximately 2.5 days) of leave out of a possible 12 weeks. (Doc. 33) at ¶ 26; (Doc. 37) at ¶ 26. Specifically, from June 4, until July 22, Cimino took the following FMLA leave:

| Date | Hours |
|---|---|
| June 11, 2015 | 4 hours |
| June 12, 2015 | 1 hour |
| June 17, 2015 | 1 hour |
| June 18, 2015 | 8 hours |
| June 24, 2015 | 1 hour |
| July 2, 2015 | 8 hours |
| July 20, 2015 | 8 hours |

(Doc. 33) at ¶ 30; (Doc. 37) at ¶ 30. Plaintiff also took holiday time and scheduled time off from July 3, to July 21, 2015. (Doc. 33) at ¶ 31; (Doc. 37) at ¶ 31.

On June 29, 2015, Guess approached Plaintiff and asked her about her father's appointments, referred to her FMLA leave, and instructed her to schedule his doctors' appointments at the beginning and end of the day. (Doc. 36) at ¶ 88; (Doc. 40) at ¶ 88; see also (Doc. 33) at ¶ 32; (Doc. 37) at ¶ 32). According to Plaintiff, "Guess portrayed that there was 'cause for concern' if Plaintiff was away from work through her body language and comments." (Doc. 36) at ¶ 90; (Doc. 40) at ¶ 90. Plaintiff informed Guess that she would try to schedule appointments at the beginning or end of her workday, but that it might be difficult because the appointments were with specialists. (Doc. 36) at ¶ 92; (Doc. 40) at ¶ 92; see also (Doc. 33) at ¶ 33; (Doc. 37) at ¶ 33. According to Plaintiff, Guess did not verbally respond. (Doc. 36) at ¶ 93. Instead, "Guess sighed, shrugged her shoulders, and tilted her head when Cimino informed her that she would [be] amend[ing] her leave because she needed more time for her father's care." (Doc. 36) at ¶ 94. Plaintiff testified that she considered Guess's response a refusal of her

4

request to take more FMLA time. (Doc. 36) at ¶ 95. As noted above, Plaintiff submitted an amended FMLA request on July 2, 2015. (Doc. 33) at ¶ 22; (Doc. 37) at ¶ 22.

Following her June 29, 2015 conversation with Cimino, Guess documented her interaction with Cimino because she did not "know why [Cimino] was changing her FMLA." (Doc. 36) at ¶ 102; (Doc. 40) at ¶ 102. The June 29, 2015 note stated:

> Discussed taking 8hrs for dad's FMLA for an appointment (FMLA paperwork indicates she is approved for 2hrs 3x a week). Changes have occurred since applying for FMLA-will update accordingly this week.
>
> Coming in late and working late to accommodate dad's IV antibiotics.
>
> Gave me her schedule for this week.

(Doc. 36) at ¶ 103; (Doc. 40) at ¶ 103.

Plaintiff testified that "Guess's actions hindered [Plaintiff]'s FMLA leave." (Doc. 36) at ¶ 108. Specifically, Plaintiff testified that she did not fully utilize the FMLA leave she required, instead choosing to care for her father in the morning and after work. (Doc. 36) at ¶¶ 109-110.

The RIF Form authorizing Cimino's termination was created in early July, and signed by Nicole Costantino, the Director of Human Relations, on July 15, 2015. (Doc. 36) at ¶¶ 144, 146; (Doc. 40) at ¶¶ 144, 146. On July 22, 2015, Guess and Constantino met with Plaintiff and informed her that the NICU Unit Director position was being eliminated due to budget reductions. (Doc. 33) at ¶ 36; (Doc. 37) at ¶ 36. According to Plaintiff, she told Guess and Costantino she was surprised and asked if there were any Clin-IV positions available in the Unit. (Doc. 36) at ¶ 165. Plaintiff testified that both Guess and Constantino said there were not any available Clin-IV positions within the NICU. (Doc. 36) at ¶ 170. However, as Plaintiff later learned, this was "not true." (Doc. 36) at ¶ 171. In fact, immediately after terminating Cimino, Guess informed the Clin IVs who were on duty that she "did get the ok to promote" and that

another Clin-IV would be added. (Doc. 36) at ¶ 200; (Doc. 40) at ¶ 200. Guess later called the remaining Clin-IVs to inform them of the same news. (Doc. 36) ¶ 201; (Doc. 40) at ¶ 201.

Guess testified that she and McLaughlin decided to add a fifth Clin IV position in or around April 2015 but waited to post the Clin-IV position "until after the [Unit Director] position was eliminated." (Doc. 36) at ¶¶ 123, 130; (Doc. 40) at ¶ 130. Specifically, Guess made "a decision to wait until after the position was eliminated to then promote someone." (Doc. 36) at ¶ 131; (Doc. 40) at ¶ 131. Guest explained that she was concerned that it would be "tumultuous" in the unit after the Unit Director position was eliminated, and she "wanted it to settle down a little bit before [she] went out there asking somebody to be promoted." (Guest Dep. (Doc. 28-2)) at 158: 5-12. Guess posted the Clin-IV position on August 11, 2015. (Doc. 36) at ¶ 204; (Doc. 40) at ¶ 204. Only internal candidates applied for the position. (Doc. 36) at ¶ 207; (Doc. 40) at ¶ 207. The position ultimately went to staff nurse, Daneen Cristiano, on September 14, 2015. (Doc. 36) at ¶ 210; (Doc. 40) at ¶ 210. Cimino never externally applied for a position at Magee-Women's Hospital. (Doc. 33) at ¶ 39; (Doc. 37) at ¶ 39.

B. **STANDARD OF REVIEW**

Summary judgment is appropriate if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a fact is "material" only if it might affect the outcome of the action under the governing law. See Sovereign Bank v. BJ's Wholesale Club, Inc., 533 F.3d 162, 172 (3d Cir. 2008) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). In ruling on a motion for summary judgment, the Court must view

6

the facts in the light most favorable to the non-moving party.  Merkle v. Upper Dublin Sch. Dist.,
211 F.3d 782, 788 (3d Cir. 2000).

C. **ANALYSIS**

1. **Count I: FMLA Interference Claim**

The Court first considers Plaintiff's FMLA interference claim.  Plaintiff bases her claim of interference on "Guess' insistence that Ms. Cimino only take time off during the end of the day, and her expressions of displeasure with Ms. Cimino's need for intermittent FMLA leave." (Complaint (Doc. 1)) at ¶ 25.  Defendant argues that Plaintiff's FMLA interference claim fails because she has not presented any evidence that she suffered any actual injury as a result of Guess's actions.  (Defendant's Brief in Support of Motion for Summary Judgment (Doc. 32)) at 4-5.  Specifically, Defendant argues that Plaintiff was permitted to take, and did in fact take, any intermittent FMLA she requested.  (Id.)  Defendant also argues that "the FMLA does not require the employer to be a mind reader and ask the employee, "'Are you sure you are taking all the leave you need?'"  (Defendant's Reply Brief (Doc. 39)) at 2.

The Court finds Defendant's arguments unconvincing.  The basis for Plaintiff's claim of interference is not that Guess failed to follow up with her to determine whether she was taking all the time she needed, but rather that Guess's actions and words *actively discouraged* her from taking leave.  The Department of Labor's regulation is clear on this point – discouraging an employee from using leave constitutes interference, even if the request for leave is granted.  See 29 C.F.R. § 825.220(b) ("Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.").  Plaintiff testified that, on June 29, 2015, Guess instructed her to schedule her

7

father's doctors' appointments at the beginning and the end of the day, and portrayed through her body language that she disapproved of Plaintiff taking time off work to care for him. (Doc. 36) at ¶¶ 88, 89, 94; (Doc. 40) at ¶¶ 88, 89, 94. Plaintiff further testified that Guess's actions "hindered" her willingness to take leave. (Doc. 142) at 143:8-13.

Defendant argues that Guess's conduct on June 29, 2015, cannot give rise to an FMLA interference claim, claiming that a single statement by a manager expressing displeasure regarding an employee's leave is not enough to establish "interference." (Doc. 32) at 5 (citing Latta v. U.S. Steel – Edgar Thompson Plant, 2013 U.S. Dist. LEXIS 170569, at *7 (W.D. Pa. Dec. 4, 2013)). Defendant further argues that Plaintiff cannot establish an "interference" claim simply based on the fact that Guess asked her to schedule her father's appointments at the beginning and the end of the work day. To support its position, Defendant cites to Kumar v. UPMC Physician Servs., 2006 U.S. Dist. LEXIS 44050, 2006 WL 1805691, *7-8 (W.D. Pa. June 28, 2006), which found no FMLA interference claim where the defendant asked the plaintiff to try to finish the work on her desk before taking leave. The Court finds Kumar distinguishable, however, as that case did not involve a manager's request to reschedule an employee's leave time. Furthermore, in Kumar, the court found that "the record reflects that work was reassigned during plaintiff's absence so that plaintiff would not face a backlog on her return." Id. at *8. In contrast, the decision Plaintiff cites, Williams v. Shenango, 986 F. Supp. 309, 320 (W.D. Pa. 1997), is more on point. There, the court denied an employer's motion for summary judgment on a plaintiff's FMLA interference claim where, among other things, the supervisor suggested the employee request to take a different week of leave. Id. The Court held that "Shenango's suggestion that Williams take leave on a different week," in addition to his initial denial of said request for leave, could be seen as interference because it may have "'chilled' or otherwise

8

discouraged Williams' assertion of FMLA rights." Id. at 320-321; see also Shtab v. Greate Bay Hotel & Casino, Inc., 173 F.Supp.2d 255, 267 (D.N.J. 2001) (finding that reasonable jurors could conclude that an employer's request to delay FMLA leave constituted interference with the employee's rights).

While a close call, the Court finds that, in light of the plain meaning of the regulation, reasonable jurors could find that Guess's conduct constitutes interference. Guess's admission that she asked Plaintiff to schedule her father's appointments at the beginning and end of the day, combined with Plaintiff's testimony regarding Guess's overall demeanor showing alleged displeasure with her request for leave, is sufficient evidence from which a reasonable jury could conclude that Plaintiff was discouraged from taking the intermittent leave to which she was entitled. Furthermore, although Defendant suggests that the Court should discount Plaintiff's "self-serving" testimony that she decided not to take time off, in part, because of Guess's actions, that is simply not the Court's role at summary judgment. Rather, it is the role of the jury at trial to assess the credibility of Plaintiff's testimony as to why she decided not to take time off. See Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) ("In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence is to be believed and all justifiable inferences are to be drawn in his favor.") (internal quotations and citations omitted).

For these reasons, Defendant's Motion for Summary Judgment on Count I will be denied.

## 2. Count II: FMLA Retaliation Claim

The Court turns next to Plaintiff's FMLA retaliation claim. To set out a prima facie claim for FMLA retaliation, Plaintiff must prove that "1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action

was causally related to her invocation of rights." Erdman v. Nationwide Ins. Co., 582 F.3d 500, 508 (3d Cir. 2009).

Here, Plaintiff has not met her prima facie burden as to Count II because she has not demonstrated a causal connection between her request for leave and her termination. The Court agrees with Defendant that Atchison v. Sears, 666 F. Supp. 2d 477 (E.D. Pa. 2009) is particularly instructive given the similarity of the facts to this case. In Atchinson, the defendant presented evidence demonstrating that the employer's decision to terminate the employee pursuant to a reduction in force was made before the employee requested FMLA leave. Id. at 491. The court, in reviewing Atchison's motion for summary judgment, found that a plaintiff could not base an FMLA retaliation claim on a request for leave made *after* the decision to terminate is made. The plaintiff argued that this general rule did not apply, however, because the decision to include him in the reduction of force was not "final" until after he requested leave. The Atchison court rejected that argument, finding that there was no evidence that the employer ever "reconsidered its decision to terminate" him after he exercised his FMLA rights. Id. at 492. The court explained that the fact that the reduction in force was "awaiting final sign-off when Atchison requested FMLA leave does not save him on the causation issue." Id.

Here, as in Atchinson, it is undisputed that Plaintiff's position was included on the list of positions subject to elimination more than a month *prior* to her request for leave to care for her father. As numerous courts have held, a plaintiff cannot establish a causal link when the decision to take adverse employment action occurs before plaintiff exercises his or her FMLA rights. See, e.g., Burch v. WDAS AM/FM Inc., 2002 WL 1471703, at *10 (E.D.Pa. June 28, 2002) ("In the instant case, however, the evidence that the decision to terminate plaintiff was made before he requested or took leave is uncontroverted. One cannot reasonably conclude that plaintiff was

10

terminated for something which occurred after the decision to terminate him was made."); Williams v. Bd. of Educ., 2009 WL 140124, at *5 (N.D.Ill. Jan. 21, 2009) ("Since defendants made their decision not to renew plaintiff's employment before she made her FMLA request, she cannot establish an FMLA claim under a retaliation theory.").

Furthermore, as in Atchinson, there is no evidence that Guess or McLaughlin ever reconsidered or wavered in the decision to eliminate Plaintiff's position after the initial RIF list was circulated in April 2015. Finally, despite Plaintiff's assertions, the fact that Guess chose not to disclose the Clin-IV position prior to her termination does not give rise to an inference of retaliation. As Guess testified during her deposition, she and McLaughlin decided not to publicly disclose the Clin-IV position until after the Unit Director position had been eliminated. Guess explained that she was concerned that it would be "tumultuous" in the unit after the Unit Director position was eliminated, and she "wanted it to settle down a little bit before I went out there asking somebody to be promoted." (Guest Dep. (Doc. 28-2)) at 158: 5-12. There is no evidence that Guess purposely withheld the information "to preclude Cimino from obtaining the position," as Cimino contends. (Doc. 36) at ¶ 9.[1]

In short, because Defendant's decision to end Plaintiff's employment was made prior to her application for FMLA leave, she cannot establish a causal connection to make out a prima facie case of retaliation. As Plaintiff has not established a prima facie case of retaliation, the Court need not address the remaining stages of the burden-shifting analysis. Accordingly, Defendant's Motion for Summary Judgment with respect to Count II will be granted.

---

[1] To the extent that Cimino argues that UPMC's failure to disclose the Clin IV position is itself an adverse action, that claim also fails, as Cimino cites to no authority that supports a claim that an employer is required to find another position for a properly discharged employee. Furthermore, Cimino cannot show that she suffered any damages as a result of UPMC's failure to disclose the Clin-IV position as it is undisputed that she did not apply for the position after it was publicly posted on August 11, 2015.

## II. ORDER

For the reasons stated above, IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment (**Doc. 31**) is **GRANTED IN PART AND DENIED IN PART**. Consistent with the foregoing, the Court **GRANTS** summary judgment as to Count II, and **DENIES** summary judgment as to Count I.

June 27, 2017

<u>s/Cathy Bissoon</u>
Cathy Bissoon
United States District Judge

cc (via ECF email notification):

All counsel of record.